UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
MAY 31 2017
RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED MAY 31 2017
CLERK

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| PUBLI-INVERSIONES DE PUERTO RICO, | ) | |
| INC., D/B/A EL VOCERO DE PUERTO RICO | ) | |
| Petitioner | ) | No. 17-1102 |
| | ) | |
| v. | ) | Board Case No. |
| | ) | 12-CA-120344 |
| NATIONAL LABOR RELATIONS BOARD | ) | |
| Respondent | ) | |

17-1141

## CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

The National Labor Relations Board hereby cross-applies to the Court for enforcement of its Order issued against Publi-Inversiones de Puerto Rico, Inc., d/b/a El Vocero de Puerto Rico on March 10, 2017, in Board Case No. 12-CA-120344, reported at 365 NLRB No. 29. On March 27, 2017, the Petitioner, Publi-Inversiones de Puerto Rico, Inc., d/b/a El Vocero de Puerto Rico filed a petition with this Court to review the same Board order. The Board seeks enforcement of its Order in full.

The Court has jurisdiction over this cross-application pursuant to Section 10(e) and (f) of the National Labor Relations Act, as amended (29 U.S.C. § 160(e) and (f)), because the Petitioner is aggrieved by the Board's order. Venue is proper in this Circuit under Section 10(e) and (f) of the Act.

/s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street SE
Washington, DC 20570

Dated at Washington, D.C.
May 31, 2017

# SERVICE LIST

*Publi-Inversiones de Puerto Rico, Inc., d/b/a*
*El Vocero de Puerto Rico v. NLRB*
Board Case No. 12-CA-120344

| | |
|---|---|
| Alberto J. Bayouth-Montes, Esq.<br>Yldefonso Lopez-Morales, Esq.<br>O'Neill & Borges, LLC<br>250 Ave Munoz Rivera Suite 800<br>American International Plaza<br>San Juan, PR 00918-1813 | Petitioner's Counsel |
| Edward Zayas<br>El Vocero de Puerto Rico<br>P.O. Box 15074<br>San Juan, PR 00902-7515 | Petitioner |
| Union de Periodistas Artes<br>Graficas Y Ramas Anexas, Local 33225<br>P O Box 364302<br>San Juan, PR 00936-4302 | Charging Party |
| Miguel Simonet Sierra Esq.<br>Krystal Santiago Sanchez, Esq.<br>101 Ave San Patricio, Suite 1120<br>Miramar Plaza<br>Guaynabo, PR 00968-2646 | Charging Party Counsel |

David Cohen
National Labor Relations Board
Region 12
South Trust Plaza
201 East Kennedy Blvd
Suite 530
Tampa, Fl 33602-5824

Acting Regional Director

National Labor Relations Board
Sub-Region 24
525 F D Roosevelt Ave Ste 1002
San Juan, PR 00918-1002

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED MAY 31 2017
CLERK

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
MAY 31 2017
RECEIVED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| PUBLI-INVERSIONES DE PUERTO RICO, INC., | ) | |
| D/B/A EL VOCERO DE PUERTO RICO | ) | |
| Petitioner | ) | No. 17-1102 |
| | ) | |
| v. | ) | Board Case No. |
| | ) | 12-CA-120344 |
| NATIONAL LABOR RELATIONS BOARD | ) | |
| Respondent | ) | |

17-1141

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2017, I filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia via hand-delivery. I certify that the foregoing document is being served today by first-class mail upon the following counsel:

Alberto J. Bayouth-Montes, Esq.
Yldefonso Lopez-Morales, Esq.
O'Neill & Borges, LLC
250 Ave Munoz Rivera Suite 800
American International Plaza
San Juan, PR 00918-1813

/s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street SE
Washington, DC 20570

Dated at Washington, DC
this 31st day of May, 2017

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Publi-Inversiones De Puerto Rico, Inc. d/b/a El Vocero De Puerto Rico *and* Union De Periodistas, Artes Graficas Yramas Anexas, Local 33225.** Case 12–CA–120344

March 10, 2017

## DECISION AND ORDER

BY ACTING CHAIRMAN MISCIMARRA AND MEMBERS PEARCE AND MCFERRAN

On September 27, 2016, Administrative Law Judge Melissa M. Olivero issued the attached decision. The Respondent filed exceptions and a supporting brief, the General Counsel and the Charging Party filed answering briefs, and the Respondent filed a reply brief.

The National Labor Relations Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[1] and conclusions[2] and to adopt the recommended Order as modified and set forth in full below.[3]

### CONCLUSIONS OF LAW

1. The Respondent, Publi-Inversiones de Puerto Rico, Inc. d/b/a El Vocero de Puerto Rico, is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. Union de Periodistas, Artes Graficas y Ramas Anexas, Local 33225 (the Union) is a labor organization within the meaning of Section 2(5) of the Act.

3. The following employees of the Respondent constitute a unit appropriate for purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> [A]ll . . . employees except . . . [the following excluded employees]: (1) Administration: President, Executive Assistant to the president, Treasurer, Comptroller, Chief Accounting Officer, and seven executive secretaries who work in any department of the Company, Chief Personnel Officer and his or her secretary and security personnel and credit manager; (2) Advertising: Agency Advertisement Sales Director, Direct Advertisement Sales Director, Classified Ads and Notices Sales Director, and Advertisement Salesperson; (3) Circulation: Circulation Department Director, Island Supervisor, Metro Area Subscriptions Supervisor, Metro Area Lighting and Post Supervisor, two (2) Chief Dispatching Officers, four (4) At Large Regional Supervisors, Newspaper Carriers and Heralds; (4) Editorial: Director, Associate Director, and Chief Editor; (5) Production: Production Department Director, (2) Shop Supervisors, (3) Press Supervisors (two during the day and one at night), Maintenance Engineer and Electrical Engineering Supervisor.

4. Since December 17, 2013, the Respondent violated Section 8(a)(5) and (1) of the Act by failing and refusing to recognize and bargain collectively with the Union as the collective-bargaining representative of the above described unit of employees.

5. Since December 17, 2013, the Respondent violated Section 8(a)(5) and (1) of the Act by refusing to bargain collectively with the Union by failing and refusing to

---

[1] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products, Inc.*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

In addition, some of the Respondent's exceptions allege that the judge's rulings, findings, and conclusions demonstrate bias and prejudice. On careful examination of the judge's decision and the entire record, we are satisfied that the Respondent's contentions are without merit.

There are no exceptions to the judge's findings that the Respondent's editors are not statutory supervisors, that the Respondent's advertising salespersons and security guards are excluded from the unit, that an employee laid off by CIN (Respondent's predecessor) shortly before it ceased operations but hired by the Respondent as soon as it began operations is included in the unit, and that the Union's December 17, 2013 letter constituted an effective demand for recognition and bargaining.

In adopting the judge's finding that the Respondent is a legal successor to CIN under *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972), and *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987), we do not rely on her statements suggesting that a finding of successorship depended on the Respondent hiring "a substantial and representative complement of CIN's employees." The Respondent was a legal successor because there was substantial continuity between the enterprises, and it employed a substantial and representative complement of employees by December 15, 2013, a majority of whom were former CIN bargaining-unit employees. In adopting the judge's finding that the Respondent is the legal successor to CIN, Acting Chairman Miscimarra does not rely on *GVS Properties, LLC*, 362 NLRB No. 194 (2015), cited by the judge.

The Respondent filed bare exceptions, asserting that the judge erred by finding that it violated Sec. 8(a)(5) and (1) by failing and refusing to furnish the Union with information requested by it on December 17, 2013. Accordingly, we find, pursuant to Sec. 102.46(b)(2) of the Board's Rules and Regulations, that these exceptions should be disregarded. See, e.g., *New Concept Solutions, LLC*, 349 NLRB 1136, 1136 fn. 2 (2007). Moreover, even if properly filed, these exceptions would lack merit. In light of the successorship finding, the Respondent's failure and refusal to furnish the Union with the requested information violated Sec. 8(a)(5) and (1).

[2] The judge neglected to include Conclusions of Law in her decision. We shall correct this inadvertent omission.

[3] We shall modify the judge's recommended Order to conform to the Board's standard remedial language and substitute a new notice to conform to the Order as modified.

furnish it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of the Respondent's unit employees.

6. The aforesaid unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

ORDER

The National Labor Relations Board orders that the Respondent, Publi-Inversiones de Puerto Rico, Inc. d/b/a El Vocero de Puerto Rico, San Juan, Puerto Rico, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to recognize and bargain with Union de Periodistas, Artes Graficas y Ramas Anexas, Local 33225 (the Union) as the exclusive collective-bargaining representative of the employees in the bargaining unit.

(b) Refusing to bargain collectively with the Union by failing and refusing to furnish it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of the Respondent's unit employees.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) On request, bargain with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

> [A]ll . . . employees except . . . [the following excluded employees]: (1) Administration: President, Executive Assistant to the president, Treasurer, Comptroller, Chief Accounting Officer, and seven executive secretaries who work in any department of the Company, Chief Personnel Officer and his or her secretary and security personnel and credit manager; (2) Advertising: Agency Advertisement Sales Director, Direct Advertisement Sales Director, Classified Ads and Notices Sales Director, and Advertisement Salesperson; (3) Circulation: Circulation Department Director, Island Supervisor, Metro Area Subscriptions Supervisor, Metro Area Lighting and Post Supervisor, two (2) Chief Dispatching Officers, four (4) At Large Regional Supervisors, Newspaper Carriers and Heralds; (4) Editorial: Director, Associate Director, and Chief Editor; (5) Production: Production Department Director, (2) Shop Supervisors, (3) Press Supervisors (two during the day and one at night), Maintenance Engineer and Electrical Engineering Supervisor.

(b) Furnish to the Union in a timely manner the information requested by the Union on December 17 and 23, 2013.

(c) Within 14 days after service by the Region, post at all of its facilities in San Juan, Puerto Rico, copies of the attached notice marked "Appendix."[4] Copies of the notice, on forms provided by the Regional Director for Region 12, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since December 17, 2013.

(d) Within 21 days after service by the Region, file with the Regional Director for Region 12 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. March 10, 2017

Philip A. Miscimarra, Acting Chairman

Mark Gaston Pearce, Member

Lauren McFerran, Member

(SEAL) NATIONAL LABOR RELATIONS BOARD

[4] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

## APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to recognize and bargain with Union de Periodistas, Artes Graficas y Ramas Anexas, Local 33225 (the Union), as the exclusive collective-bargaining representative of our employees in the bargaining unit.

WE WILL NOT refuse to bargain collectively with the Union by failing and refusing to furnish it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of our unit employees.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

> [A]ll . . . employees except . . . [the following excluded employees]: (1) Administration: President, Executive Assistant to the president, Treasurer, Comptroller, Chief Accounting Officer, and seven executive secretaries who work in any department of the Company, Chief Personnel Officer and his or her secretary and security personnel and credit manager; (2) Advertising: Agency Advertisement Sales Director, Direct Advertisement Sales Director, Classified Ads and Notices Sales Director, and Advertisement Salesperson; (3) Circulation: Circulation Department Director, Island Supervisor, Metro Area Subscriptions Supervisor, Metro Area Lighting and Post Supervisor, two (2) Chief Dispatching Officers, four (4) At Large Regional Supervisors, Newspaper Carriers and Heralds; (4) Editorial: Director, Associate Director, and Chief Editor; (5) Production: Production Department Director, (2) Shop Supervisors, (3) Press Supervisors (two during the day and one at night), Maintenance Engineer and Electrical Engineering Supervisor.

WE WILL furnish to the Union in a timely manner the information requested by the Union on December 17 and 23, 2013.

PUBLI-INVERSIONES DE PUERTO RICO, INC.
D/B/A EL VOCERO DE PUERTO RICO

The Board's decision can be found at www.nlrb.gov/case/12–CA–120344 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.

*Ana Ramos-Fernández, Esq.*, for the General Counsel.
*Yldefonso Lopez Mórales, Esq.*, for the Respondent.
*Miguel Simonet Sierra, Esq.*, for the Charging Party.

## DECISION

### STATEMENT OF THE CASE

MELISSA M. OLIVERO, Administrative Law Judge. This case was tried in San Juan, Puerto Rico, on January 26–28, 2016. Union de Periodistas, Artes Graficas y Ramas Anexas, Local 33225 (Union) filed the charge on January 9, 2014, and an amended charge on February 26, 2014. The General Counsel issued the complaint on October 30, 2015, alleging that Publi-Inversiones de Puerto Rico, Inc., d/b/a El Vocero de Puerto Rico (Respondent), as a successor to Caribbean International News Corporation, d/b/a El Vocero de Puerto Rico, Inc. (CIN), violated Section 8(a)(5) and (1) of the National Labor Relations Act (Act) by failing and refusing to meet and bargain with the Union and failing and refusing to provide the Union with certain requested information. The parties were given a full opportunity to participate, to introduce relevant evidence, to examine and cross-examine witnesses, and to file briefs. On the entire record, including my observation of the demeanor of the

witnesses,[1] and after fully considering the briefs filed by the parties, I make the following

## FINDINGS OF FACT

### I. JURISDICTION

Respondent Publi-Inversiones de Puerto Rico, Inc., d/b/a El Vocero de Puerto Rico, a corporation, is engaged in the publication of a newspaper of general circulation in Puerto Rico at its facility in San Juan, Puerto Rico, where it annually derives gross revenues in excess of $200,000, and purchases goods valued in excess of $50,000 directly from points outside the Commonwealth of Puerto Rico. Respondent admits, and I find, that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. (GC Exh. 1(l).) The parties have further stipulated, and I find, that the Union is a labor organization within the meaning of Section 2(5) of the Act. (Jt. Exh. 23, para. 6.)

### II. ALLEGED UNFAIR LABOR PRACTICES

#### *A. El Vocero as Operated by CIN*

Caribbean International News Corporation, d/b/a El Vocero de Puerto Rico, Inc. (CIN), published El Vocero de Puerto Rico (El Vocero), a newspaper of general circulation, from a date unspecified in the record until November 2013.[2] CIN's main office was located at a leased facility located at Constitution Avenue, Puerta de Tierra, Puerto Rico (Puerta de Tierra facility). CIN's administrative and editorial work was performed at its Puerta de Tierra facility. Its presses were located at a leased facility located at Industrial Park (Sector Matadero), Puerto Nuevo, Puerto Rico (Puerto Nuevo facility). (Jt. Exh. 23.) CIN's printing and inserting work was performed at the Puerto Nuevo facility. (Jt. Exh. 23.)

The Puerto Nuevo facility is a three-story building. (Tr. 24.) Paper rolls were stored in one section of the building, presses were located in another, and dispatching and inserting work was performed in another. A small section of the building contained the offices and restrooms.

CIN had two presses at its Puerto Nuevo facility. (Tr. 16.) Two pressmen worked on the night shift to operate the presses. In addition, 7 press assistants, one mechanic, and a dispatcher worked the night shift. (Tr. 17.) CIN's employees were organized into the following 13 departments: administration; personnel; workshop; photography; classified; circulation; reception; guards; editorial; sales; accounting; press; and dispatch. (Tr. 86–88.)

CIN also published several magazines at its Puerto Nuevo facility. From 2004 through 2009, CIN published the following magazines: Sociales; Habitat; Surf; and Al Volante. (Tr. 19.) Habitat and Sociales continued to be published through 2012 or 2013. (Id.) All of these magazines were printed and placed inside the newspaper at the Puerto Nuevo facility. (Tr. 19.) The magazines were the same size as the newspaper. (Tr. 38.) The magazines were never distributed independently of El Vocero; they were always inserted in the newspaper. (Tr. 33.) The magazines were printed on the same type of paper and with the same machines as the newspaper. (Tr. 32.)

CIN also maintained a website and social media presence for El Vocero. According to the undisputed testimony of Jose Ortega, El Vocero has had an Internet website since 2011 or 2012. (Tr. 177–178.) Moreover, a 2012 printed edition of the newspaper references the newspaper's website, www.vocero.com. (GC Exh. 7.)

Jose Manuel Hernandez Rivera worked as a pressman at El Vocero under CIN. (Tr. 16.) Hernandez Rivera always worked the night shift, but his hours varied. (Tr. 34.) His duties as a pressman included producing the newspaper and evaluating its quality. (Tr. 16.) His supervisor was Eligio Dekony, CIN's press director. As a pressman, Hernandez Rivera was provided safety equipment and tools by CIN. The safety equipment included gloves, hearing protection, and safety glasses. (Tr. 31.) Other employees and contracted personnel did not use the same safety equipment as press employees; inserters and dispatchers used only hearing protection. (Tr. 32.)

CIN used inserters (also referred to as "inserts") to place advertisements and shoppers[3] into the newspaper. (Tr. 20.) CIN subcontracted its inserters through three separate agencies between 2001 and 2012. From 2001 to 2005, CIN obtained its inserters through Maricau. (Tr. 59.) From 2005 to 2010, Respondent obtained inserters from Professional Multi-Sales and Service, Inc. (GC Exhs. 2, 3; Tr. 61.) From 2010 to 2012, CIN obtained inserters from Multi-Services Corp. (Tr. 64.)

Olga Mendez Gonzalez worked as an inserter for CIN from 2001 to 2012. (Tr. 59.) During this time, she was employed by the three companies referenced above. Although her pay, supervisors, and shifts varied over time, her duties did not. As an inserter, Mendez Gonzalez inserted shoppers and other materials into El Vocero.[4]

Inserters had only passing contact with the employees of El Vocero.[5] (Tr. 67–68.) These workers might exchange pleasantries in passing or before or after a shift. (Tr. 20, 72, 74.) Inserters were not allowed to talk during work hours. (Tr. 70–71.) Inserters worked the day shift under Maricau and the night shift under Professional Multi-Sales and Multi-Services.

[1] Although I have included citations to the record to highlight particular testimony or exhibits, my findings and conclusions are not based solely on those specific record citations, but rather on my review and consideration of the entire record for this case. My findings of fact encompass the credible testimony and evidence presented at trial, as well as logical inferences drawn therefrom.

[2] CIN published El Vocero since at least 1998, as the collective-bargaining agreement between CIN and the Union in evidence as Joint Exhibit 1 was signed in 1998.

[3] Shoppers are sales flyers from stores. (Tr. 77.)

[4] Although Respondent invites me to discredit Mendez Gonzalez' testimony because she is the sister of Antonio Mendez Gonzalez, the Union's secretary-treasurer, I decline to do so. (R. Br. p. 26, fn. 10.) Her testimony was given in a steady and sure manner. She did not waver under cross-examination. More importantly, however, her testimony was not contradicted in any meaningful way by more credible testimony or evidence. Therefore, I have credited the testimony of Mendez Gonzalez.

[5] Mendez Gonzalez' testimony on this point was not effectively rebutted by any other witness or evidence.

CIN laid off about 30 employees on September 19, 2012. (Tr. 96.) All 30 of the laid off employees were union members. Id.

As of December 1, 2013, CIN's Board of Directors consisted of Fernando Ortega (President), Joey Jiménez (Vice President), Hiram Irizarry (Treasurer), Noel Berríos (Secretary), Gerardo Larrea, Dionisio Trigo, Raúl Betancourt, Tony Larrea, and José (Pepe) Dueño. (Jt. Exh. 23.) Maria Luisa Roca was CIN's Human Resources Director. (Tr. 104).

*B. El Vocero's Labor Relations under CIN*

Union de Periodistas, Artes Graficas y Ramas Anexas. Local 33225 (Union) was the exclusive collective-bargaining representative of a group of employees employed by CIN. CIN remitted dues to the Union on behalf of its employees through at least October 2013. (GC Exh. 5.) CIN was signatory to a series of collective-bargaining agreements with the Union, the most recent of which had an expiration date in 2001 (the agreement). (Jt. Exh. 1(b).) However, the agreement remained in effect by the operation of article 27, which stated that the agreement would remain in effect until negotiations for a successor agreement had lawfully concluded.

By the plain language of article I of the agreement, the bargaining unit represented by the Union consisted of:

> A. [A]ll . . . employees except as provided in Section B of this article and those that may be excluded pursuant to Section 5 of Article XX.
>
> B. The following are excluded:
> EL VOCERO
> 1. Administration: President, Executive Assistant to the president, Treasurer, Comptroller, Chief Accounting Officer, and seven executive secretaries who work in any department of the Company, Chief Personnel Officer and his or her secretary and security personnel and credit manager.
> 2. Advertising: Agency Advertisement Sales Director; Direct Advertisement Sales Director, Classified Ads and Notices Sales Director, and Advertisement Salesperson.
> 3. Circulation: Circulation Department Director, Island Supervisor, Metro Area Subscriptions Supervisor, Metro Area Lighting and Post Supervisor, two (2) Chief Dispatching Officers, four (4) At Large Regional Supervisors, Newspaper Carriers and Heralds.
> 4. Editorial: Director, Associate Director, and Chief Editor.
> 5. Production: Production Department Director, (2) Shop Supervisors, (3) Press Supervisors (two during the day and one at night), Maintenance Engineer and Electrical Engineering Supervisor.

Section 5 of article XX indicated that if CIN created a new job classification, it was required to notify the Union in writing and, at the Union's request meet and bargain over whether the new position would be covered under the Agreement and the salary for the new position.[6] Section 5 of article XX also sets forth a procedure in the event that the parties would be unable to reach agreement.

The General Counsel submits that the bargaining unit of employees represented by the Union consists of:

> All full time and regular part time employees employed by the Employer, including maintenance employees, messengers, receptionist, switchboard operator, press employees, press maintenance, press assistant, press mechanics, classified and edit clerks, utility employees, excess employees and promotion employees, secretaries and clerks, district managers drivers, radio operator, workshop, district manager group leaders, mechanics assistant, reporters, photographers, accountants, graphic artist, editors and electricians and excluding the president, president assistant, treasurer, comptroller, accounting chief, 7 executive assistants working at any department, human resources director and its secretary, guards and credit manager, agency ads-sales director, direct ads-sales director, classified ads-sale director and ads-salesperson, circulation department director, supervisors-island, supervisor of subscription metro zone, post and street light supervisors, chief of dispatch, regional supervisors at large, director associate, chief editor, production director, workshop supervisors; press supervisor, maintenance engineer and electric engineer supervisors and "inserts."

(GC Exh. 1(g), para. 6(a).) Respondent denied that the unit as alleged by the General Counsel is correct. (GC Exh. 1(l).) The General Counsel states in her brief that the unit is based on the language of articles I and XIX of the agreement. (GC Br. p. 6.) Article XIX is the salary scales for CIN's employees and the listed titles are those used by the General Counsel as employees included in the unit.[7] Editors are included among the positions in the salary scales contained in article XIX. The General Counsel added the group "inserts," which was not listed in the salary schedule in article XIX, to the group of excluded employees. However, the evidence is clear that inserters were never employees of CIN.[8]

*C. CIN's Bankruptcy Proceedings*

CIN filed a voluntary petition for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §1101 et seq.) on September 20, 2013. (Jt. Exh. 2.) On October 15, 2013, upon a motion filed by CIN, the United Stated Bankruptcy Court for the District of Puerto Rico converted the case to a liquidation under Chapter 7 (11 U.S.C. §701 et seq.) and appointed a trustee. Id.

The Bankruptcy Trustee filed a Notice of Intent to Sell Property at Public Sale (notice). (Jt. Exh. 2.) Following a hearing, on November 2, 2013, the Bankruptcy Court approved the public sale. The Union initially objected to the notice. (Jt. Exh. 2.)

---

[6] On March 23, 2016, the parties submitted a joint motion to admit an English translation of art. XX, sec. 5, into the record as Jt. Exh. 1(b)-(i). The motion is granted.

[7] The "maintenance employees" referred to by the General Counsel in her unit description are listed as "janitors" in Jt. Exh. 1.

[8] I shall use the unit description contained in the Union's collective-bargaining agreement with CIN.

The Union, however, withdrew its objection subject to an amendment to the notice to include the following language:

> Nothing in this Sale Order or the Asset Purchase Agreement shall be held to limit any independent obligation of the Buyer that potentially could arise after the closing pursuant to the National Labor Relations Act, 29 U.S.C. §145 et seq.

On November 22, 2013, Respondent acquired the property of CIN at the public sale referenced above. (Jt. Exh. 23.) Respondent was the only bidder at the sale and paid $1.9 million for CIN's assets. (Jt. Exh. 2.) CIN was to cease its operations on November 30, 2013, and the transfer of assets was to be completed by December 1, 2013. (Jt. Exh. 2.) It is not clear from the record exactly when CIN ceased production of El Vocero, but it appears to have been sometime in November 2013. (Tr. 14.)

*D. Hiring of Employees Post-Bankruptcy*

After the sale, Respondent gave a letter to each of CIN's employees.[9] (Jt. Exh. 3; Tr. 24–25.) This letter, dated November 25, 2013, advised the employees to contact Respondent to apply for employment. (Id.) Hernandez Rivera received his letter from Dekony, who remained his supervisor after the sale of CIN's assets. (Tr. 39–40.) As instructed in the letter, Hernandez Rivera contacted Ruth Roman, Respondent's Human Resources Director, about applying for employment. (GC Exh. 1(l); Tr. 40.)

Dekony advised employees that they would meet with human resources to fill out applications. (Tr. 41.) Hernandez Rivera sent in his resume via email. He further went to one of Respondent's facilities to meet with human resources the day after El Vocero (under CIN) had closed. However, when Hernandez Rivera arrived for the meeting, he was told that he needed to go to El Vocero's offices in San Juan to apply. (Id.)

When he arrived in San Juan, Hernandez Rivera was taken to a room and given an employee handbook, a set of rules, and documents to complete. (Tr. 41–42.) While looking over the employee manual, Hernandez Rivera noticed several differences between Respondent's work rules and those of CIN. (Tr. 43–45.) For example, employees would receive fewer holidays, sick days, and vacation days. (Tr. 43, 45.) Additionally, overtime would be paid at time-and-a-half instead of double-time. (Tr. 43.) Respondent's policies regarding dress code, rules of conduct, absenteeism, and attendance would be more stringent than those of CIN.[10] (Tr. 45.)

After being given the documents, Hernandez Rivera was sent to another room to fill out documents and for an interview. (Tr. 50–51.) After completing the computer portion of the process, Hernandez Rivera was told he could leave. Hernandez Rivera did not have an interview because, he said, Dekony already knew him. (Tr. 25.) He was hired as a pressman and started work for Respondent on December 1, 2013. (Tr. 21.)

*E. El Vocero as Operated by Respondent*

Since December 1, 2013, Respondent has been publishing El Vocero de Puerto Rico (El Vocero) in paper and digital formats. Since 2015, Respondent has also been publishing the following 5 magazines: Mirame; Zona Sport; Bienestar Total; Capital; and Habitat. Mirame and Zona Sport are sold for $2.50 and the other magazines are offered free of charge. (Jt. Exh. 23; R. Exh. 1A and 1B.) These magazines were printed on glossy paper, different from the paper upon which El Vocero is printed. (Tr. 146.)

Respondent's Board of Directors makes its major operational and financial decisions. (Jt. Exh. 23.) As of December 1, 2013, Ortega was the president, Jiménez was the vice president, Irizarry was treasurer, and Berríos was the secretary of Respondent's Board. Of CIN's nine-person Board of Directors, five (Fernando Ortega, Joey Jiménez, Hiram Irrizarry, Noel Berríos, and José (Pepe) Dueño) remain as part of Respondent's Board of Directors. (Jt. Exh. 23.)

From December 1, 2013, through September 21, 2015, Respondent's administration and editorial departments operated at the Puerta de Tierra facility previously used by CIN. However, since September 21, 2015, these departments have operated at a facility located on Ponce de Leon Avenue in Santurce. (Jt. Exh. 23.) Since December 1, 2013, Respondent's operations, including the press, dispatch, and inserting of advertisements, have taken place at the same Puerto Nuevo facility previously used by CIN. (Jt. Exh. 23.)

Respondent published its first edition of El Vocero on December 1, 2013, shortly after CIN ceased operations. Respondent made the following changes to the newspaper: the logo was redesigned; the background color was changed from blue to red, with the words "El Vocero" in white; the typography has changed and the slogan "the truth has no price" added; the size of the paper was made smaller; each edition is limited to 32–48 pages; several sections or segments were renamed; Respondent refers to its reporters as "megareporters"; and, at some point after 2014, Respondent discontinued the use of the reproduction of negatives process and now uses the computer-to-plate process.[11] (Jt. Exhs. 7, 8, 9, 23.) Respondent continued to use the website www.vocero.com as its Internet platform for El Vocero. (Tr. 124–125.)

Respondent's operations are broken down into the following 4 departments: administration; editing; production; and sales. (Jt. Exh. 23.) Respondent's organizational charts indicate that each department is further broken down into several sub-departments. (Jt. Exhs. 14, 15.) For example, Respondent's administration department includes security, maintenance, reception, and human resources. Respondent's sales department includes payroll and accounting, as well as classifieds. Re-

[9] The letter further advised employees that Respondent is a new corporation, "completely different and unrelated to [CIN]." Respondent further asserted that it is not a continuation of or successor to CIN. (Jt. Exh. 3.)

[10] I credit Hernandez Rivera's affidavit testimony regarding changes in Respondent's work policies and rules, as the affidavit was given closer in time to the events at issue. Moreover, whether Hernandez Rivera noticed the changes immediately or not, there is no dispute that changes were made by Respondent to employee work rules prior to its commencement of operations.

[11] No explanation was provided for the differences between these two processes.

spondent's production department includes press and dispatch. (Jt. Exh. 14.)

Since commencing operations in December 2013, Respondent's work force has fluctuated at around 100 employees. As of December 15, 2013, Respondent employed 105 individuals. (Jt. Exhs. 10, 11, 12, 13, 23.)

Between December 1, 2013, and January 31, 2014, Respondent employed the following number of bargaining unit employees, some of whom were also previously employed by CIN:

| DEPARTMENT | NUMBER EMPLOYED BY RESPONDENT | NUMBER FORMERLY EMPLOYED BY CIN |
|---|---|---|
| Editing | 5 | 3 |
| Editorial | 18 | 12[12] |
| Pressmen/Press Asst. | 8 | 7 |
| Pre-Press/Dispatch | 2 | 2[13] |
| Classified | 2 | 0 |
| Promotion Events | 1 | 0 |
| TOTAL | 36 | 24 |

(Jt. Exh. 23, paras. 23, 24, 25, 26, 27, 28.) The names of the employees listed in the chart above are set forth in Jt. Exh. 23. The chart does not include employees who are clearly excluded from the unit by the language of the collective-bargaining agreement, including managers, supervisors, confidential/administrative employees, advertising salespersons, and security guards. The chart also does not include circulation or distribution personnel, as both CIN and Respondent subcontracted this service through another business. (Tr. 83.) Furthermore, the chart does not include inserters, who were never employees of CIN, and, thus, not included in the unit.[14]

As stipulated by the parties, Respondent employed 14 managerial or supervisory personnel during the relevant time period. (Jt. Exh. 23, para. 18.) Relevant here, from December 1, 2013, until at least January 31, 2014, Respondent employed General Director Edward Zayas, Production Director Eligio Dekony, and Human Resourced Director Ruth Román. (Jt. Exh. 23.) The parties have stipulated, and I find, that these individuals are supervisors of Respondent within the meaning of Section 2(11) of the Act and agents of Respondent within the meaning of Section 2(13) of the Act. Id. Dekony previously worked at El Vocero under CIN; Zayas did not. It is unclear from the record whether Román worked for CIN before the asset sale, but CIN's human resources director was Maria Luisa Roca.

There is no dispute that managers, supervisors, and confidential/administrative employees are properly excluded from the bargaining unit. Of the 14 managers and supervisors employed by Respondent during the relevant time period, 3 were previously employed by CIN. (Jt. Exh. 23, para. 18; GC Exh. 5, p. 2.)

Advertising salespersons are listed among the excluded categories of employees in the unit description in the collective-bargaining agreement between CIN and the Union.

Ruth Román testified that Respondent's editors are supervisors. However, she did not offer any specific examples of how the editors exercise supervisory authority.

Inserters are regular part-time employees of Respondent and are part of the production and printing area or department. Insert employees insert ads, shoppers, and other promotional materials into the newspaper. The number of inserters employed by Respondent has fluctuated between 27 and 51. Inserters work mostly night shifts. (Jt. Exhs. 16, 23.) Inserters are supervised directly by Martina Esquilin and indirectly by Eligio Dekony. Inserters work in the same area of the Puerta Nuevo facility as the pressmen, press assistants, mechanics, and dispatcher. Inserters have the same work rules as other employees and receive hourly compensation and benefits similar to other employees, except that they do not receive health benefits because they are part-time employees.

Unlike Respondent's other employees, inserters earn only $7.25 per hour. (Jt. Exh. 10.) For example, press employees of Respondent earn between $11.45 and $24.04 per hour.[15] The job description for the position of inserter describes the functions of the position as inserting 100 packs in one step or 50 in two steps and performing other tasks or functions as assigned by his or her immediate supervisor. (Jt. Exh. 16.) The job description does not appear to require special skills or training, as it requires only the abilities to work in a team setting with little supervision, to work under pressure, and to work rotating schedules and overtime, as well as manual skills, punctuality, and good physical condition. (Jt. Exh. 16).

All of Respondent's other employees work full-time. Among their benefits, full-time employees receive sick leave, maternity leave, vacation leave, overtime, a health plan, and a Christmas bonus. (Jt. Exh. 23.)

Dekony testified that Respondent's inserters are in "constant communication" with other departments, including dispatch and the press. (Tr. 159.) However, I found his testimony on this point vague and unconvincing. When asked to provide details as to how the inserters communicate with the other departments, he stated:

> . . . [W]hen we have the Mayaguez truck . . . we make sure that it is completely full before it goes out with the press and the inserts. If we stop before, the truck cannot come out, and

[12] Eleven of the twelve employees were employed by CIN until it ceased operations on November 20, 2013, and one was employed through September 12, 2013, when CIN laid off 30 union-member employees. (Jt. Exh. 23, para. 24; Tr. 96.) I have included he laid off employee among those previously employed by CIN because he was laid off shortly before CIN ceased operations and he returned to work for Respondent as soon as it commenced publishing El Vocero. See *Cincinnati Bronze*, 286 NLRB 39, 45–46 (1987); *Derby Refining, Co.*, 292 NLRB 1015, 1016 (1989), enfd 915 F.2d 1448 (10th Cir. 1990).

[13] Dispatch Supervisor Hector Concepcion is not included in this number as he is an admitted supervisor of Respondent.

[14] No evidence was adduced at the hearing as to whether the advertising salespersons share a community of interest with Respondent's other employees.

[15] A comparison of the names of the press employees in Jt. Exh. 23 paras. 25 and 49–50 and the payroll records contained in Jt. Exh. 10 indicate that the press department is department 300004 and inserters work in department 300008.

> for us, it is very important, and we always make sure that the first three trucks are completely full, and for that we need communication of the three departments.

(Tr. 159–160.) Dekony did not testify to specific interactions between inserters and other employees or the frequency of any such interactions. He further gave ambiguous testimony regarding inserters assisting other employees by "help[ing] out with the machines." (Tr. 160.) Dekony did not specify the type of machines or how often any such help is rendered. Due to the imprecise nature of this testimony, I do not credit it.

Additionally, Dekony testified that one inserter has become a press assistant. (Tr. 167.) Dekony did not provide any more detail as to how this transfer occurred or when it occurred.

Hernandez Rivera worked for Respondent as a pressman from December 1, 2013, through February 28, 2014.[16] Hernandez Rivera testified that after Respondent began its operations, he worked in the same building and had the same duties as he did under CIN. (Tr. 21.) He further testified that he performed his work on the same presses and had the same supervisor under Respondent as he did under CIN. (Tr. 22.) He continued to work a night shift, although the start and end times of his shifts varied with the needs of the company. (Tr. 22.)

The parties have stipulated that Respondent's operations depend on integrated work from the different departments of the newspaper. The printing area, inserting, and dispatch are all located in the same area. The newspaper is printed and the ads inserted in the same building, then the paper is distributed. (Jt. Exh. 23.)

Following Respondent's purchase of CIN's assets, it made certain changes to the Puerta de Tierra facility. Among these, Respondent changed carpets and desks, some offices were remodeled, walls were installed, and a photocopy machine was replaced.

### *F. The Union's Requests to Meet and Bargain and for Information*

On December 17, 2013, the Union sent a letter to Respondent seeking to meet and bargain for a new collective-bargaining agreement. (Jt. Exh. 17.) In its letter, the Union stated that it had been the exclusive collective-bargaining representative for a unit of El Vocero's employees for over 39 years. The Union also proposed three dates for negotiations.

The Union's December 17 letter also requested that Respondent furnish the Union with the following information: a list of all employees including name and current classification and a flow chart reflecting the current positions by hierarchy. (Jt. Exh. 17.)

The Union did not receive a response to its December 17 letter. Therefore, on December 23, the Union sent another letter to Respondent. (Jt. Exh. 18.) This second letter reiterated the Union's desire to begin negotiating for a successor agreement and its requests for information.

On December 30, 2103, Respondent replied to the Union, indicating that its letters of December 17 and 23 had been received and referred to its legal counsel. (Jt. Exh. 19.) None of the information requested by the Union was provided with Respondent's December 30 letter and Respondent did not agree to meet and bargain for a successor agreement.

On January 14, 2014, the Union sent a follow-up letter to Respondent. (Jt. Exh. 20.) The Union asked Respondent for the name of its legal advisors, so that the Union could provide this information to its own legal counsel.

On October 22, 2015, the Union sent another letter to Respondent seeking to meet and bargain. (Jt. Exh. 21.) The Union again proposed three dates for negotiations. On October 30, 2015, Respondent replied to the Union indicating that it was not a successor to CIN and that it would not meet and bargain. (Jt. Exh. 22.) Respondent has not furnished the Union with the information first requested in its December 17 letter. (Jt. Exh. 23.)

## Discussion and Analysis

### *A. Witness Credibility*

A credibility determination may rely on a variety of factors, including the context of the witness' testimony, the witness' demeanor, the weight of the respective evidence, established or admitted facts, inherent probabilities and reasonable inferences that may be drawn from the record as a whole. *Double D Construction Group, Inc.*, 339 NLRB 303, 305 (2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001) (citing *Shen Automotive Dealership Group*, 321 NLRB 586, 589 (1996)), enfd 56 Fed. Appx. 516 (D.C. Cir. 2003). Credibility findings need not be all-or-nothing propositions—indeed, nothing is more common in all kinds of judicial decisions than to believe some, but not all, of a witness' testimony. *Daikichi Sushi*, 335 NLRB at 622. Many of the facts in this case are not in dispute. However, to the extent needed, my credibility findings are incorporated into the findings of fact set forth above.

### *B. Legal Standards Regarding Successorship*

In *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972), the United States Supreme Court approved the approach taken by the Board with respect to determining whether a new company was a successor to a predecessor employer. 406 U.S., at 280–281, and fn. 4. This approach, which is factual in nature and based upon the totality of the circumstances, requires that the Board focus on whether the new company has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987), citing *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 184 (1973). The Board's focus is on whether there is substantial continuity between the enterprises. *Fall River Dyeing*, 482 U.S. at 43. The thrust of the Court's decision in *Fall River Dyeing* is that stability in labor relations and the free flow of commerce during a transition between employers are best achieved by protecting existing bargaining rights. *GVS Properties, LLC*, 362 NLRB No. 194, slip op. at 4 (2015).

Thus, the Board examines a number of factors in determining successorship: whether the business of both employers is essentially the same; whether the employees of the new compa-

[16] Although Hernandez Rivera referred to Respondent as "Public Investments," I do not find that this minor misstep detracts from his overall credibility.

ny are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers. 482 U.S. at 43. The Board conducts its analysis from the point of view of an employee. As stated by the Supreme Court, the Board keeps in mind the question of whether those employees who have been retained view their job situations as essentially unaltered. *Fall River Dyeing,* 482 U.S. at 43, citing *Golden State Bottling Co.*, 414 U.S., at 184. Accordingly, the Respondent's bargaining obligation turns on whether a majority of its employees in an appropriate bargaining unit were employed by the predecessor, and if there exists substantial continuity between the enterprises. *A.J. Myers & Sons,* 362 NLRB No. 51 (2015).

It should be noted that the bankruptcy of a predecessor and the purchase of assets under court order by a third party does not bar a finding of successorship. *Decor Noel, Inc.,* 283 NLRB 911, 915 (1987). Rather, the Board looks at all the circumstances to determine whether the employing entity is the same. *Lloyd Flanders*, 280 NLRB 1216 (1986), citing *Premium Foods, Inc. v. NLRB*, 709 F.2d 623 (9th Cir. 1983).

*C. Respondent is a Successor to CIN*

Applying the facts of this case to the standards set forth above, I find that the General Counsel has established that Respondent is a successor to CIN. Respondent's business is virtually indistinguishable from that of CIN. CIN published a newspaper of general circulation and Respondent continues to do so. Although some changes were made to the appearance of the newspaper, this does not change the fact that Respondent still publishes a newspaper. As indicated above, Respondent acquired the assets of CIN at a bankruptcy auction in late November 2013. By December 1, 2013, Respondent was publishing El Vocero at the same location, using the same equipment, and in the same manner as it had been done by CIN. By December 15, 2013, Respondent employed a substantial and representative complement of CIN's bargaining unit employees.

I do not accept Respondent's arguments that changes in the attendant magazine publications and Internet and social media presence indicate a change in business operations. Respondent uses a similar production process, produces the same product at the same location, and has the same body of customers as CIN. (Jt. Exh. 23, paras. 12–14.) The newspaper continues to be distributed free of charge to customers in Puerto Rico and parts of the continental United States, just as it had been by CIN. Any changes made to the appearance of El Vocero were cosmetic in nature and wholly inadequate to show a change in the essential nature of the business. Furthermore, although Respondent now produces different magazines on a different type of paper, some of which it sells separately from El Vocero, it did not start to do so until 2015.

Significantly, from the perspective of Respondent's employees, their jobs did not change. Hernandez Rivera's uncontroverted testimony established that he performed the same work, on the same presses, in the same location, and under the same supervisor for Respondent as he had under CIN. Although the record is unclear as to how the process for producing the newspaper changed when it changed from the reproduction of negative process to the computer-to-plate process, I do not find this difference changed the essential job duties of Respondent's bargaining unit employees. I find that this is important because in the eyes of Respondent's employees, their job duties continued unchanged after the sale of CIN's assets. See *Fall River Dyeing,* 482 U.S. at 44 (finding substantial continuity although employer changed its dyeing process because, from the perspective of an employee, the essential nature of the employees' jobs did not change.)

The main issue in the case revolves around whether Respondent hired a substantial and representative complement of CIN's employees. For the reason set forth herein, I find that Respondent hired a substantial and representative complement of CIN's bargaining unit employees by December 15, 2013. I also find that advertising salespersons and inserters should not be considered when determining whether a substantial and representative complement of CIN's unit employees had been hired. Furthermore, I find that Respondent's editors should be included among the classifications of employees considered in determining the substantial and representative complement.

Advertising salespersons and security guards are specifically listed among the excluded categories of employees in the unit description in the collective-bargaining agreement between CIN and the Union. Thus, they should not be considered in determining whether Respondent hired a substantial and representative complement.

Furthermore, despite Ruth Román's testimony at the trial, I do not find that Respondent's editors are supervisors. Section 2(11) of the Act provides that a supervisor is one who possesses, "authority, in the interest of the employer, to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward, or discipline other employees, or to responsibly direct them, or to adjust their grievances, or effectively recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." Under Board and Supreme Court precedent, in order to be a statutory supervisor, an individual must have the authority to effectuate or effectively recommend at least one of the supervisory indicia enumerated in Section 2(11) of the Act, using independent judgment in the interest of the employer. *Oakwood Healthcare, Inc.,* 348 NLRB 686, 687 (2006) (citing *NLRB v. Kentucky River Community Care,* 532 U.S. 706 (2001)).

The Board construes a lack of evidence on any of the elements necessary to establish supervisory status against the party asserting that status. *Brusco Tug & Barge,* 359 NLRB 486, 491 (2012), citing *Dean & Deluca New York, Inc.*, 338 NLRB 1046, 1048 (2003). Supervisory status is not proven where the record evidence "is in conflict or otherwise inconclusive." *Phelps Community Medical Center,* 295 NLRB 486, 490 (1989). "[M]ere inferences or conclusionary statements, without detailed, specific evidence, are insufficient to establish supervisory authority." *Alternate Concepts, Inc.,* 358 NLRB 292, 294 (2012); see also *Avante at Wilson, Inc.*, 348 NLRB 1056, 1057 (2006) ("[g]eneral testimony asserting that employees have supervisory responsibilities is not sufficient to satisfy the burden of proof when there is no specific evidence supporting the testimony" (citations omitted)); *Golden Crest Healthcare Cen-*

*ter,* 348 NLRB 727, 731 (2006). In this case, Respondent produced no evidence, other than the bare assertion of Ruth Román, that its editors are supervisors. As such, I find that Respondent's editors are not supervisors and are properly included in the unit.

Critical to a successorship finding is whether the bargaining unit of the predecessor employer remains appropriate for the successor employer. *Paramus Ford, Inc.,* 351 NLRB 1019, 1023 (2007). In *Paramus Ford,* the employer challenged the appropriateness of a historical unit of service and parts department employees. Id. As in *Paramus Ford,* the Union here has represented the unit of El Vocero employees set forth above for a significant period of time. Under extant Board law, the unit sought by the Union and alleged in the complaint need not be the only or even the most appropriate unit; all that is required is that the unit be *an* appropriate unit. (Emphasis in original.) Id. citing *Bartlett Collins Co*., 334 NLRB 484 (2001); *Gregory Chevrolet, Inc.*, 258 NLRB 233, 238 (1981).

Regarding the appropriateness of historical units, the Board's longstanding policy is that a "mere change in ownership should not uproot bargaining units that have enjoyed a history of collective bargaining unless the units no longer conform reasonably well to other standards of appropriateness." 351 NLRB at 1024. The party challenging a historical unit bears the burden of showing that the unit is no longer appropriate. Id. The evidentiary burden for such a showing is heavy. Id. "Compelling circumstances" are required to overcome the significance of bargaining history. Id. citing *Cadillac Asphalt Paving Co.*, 349 NLRB 6, 9 (2007).

In this case, Respondent has not shown any compelling circumstances to overcome the appropriateness of the historical bargaining unit set forth in the collective-bargaining agreement between CIN and the Union. Respondent did not produce any credible evidence that inserters, advertising salespersons, and security guards share a community of interest with the historically appropriate unit. The historically appropriate unit, as set forth in the collective-bargaining agreement between the Union and CIN excludes advertising salespersons and security guards. Circulation or distribution employees are not listed, as CIN subcontracted these services. The agreement contains no reference to inserters, as they were not employees of CIN. No credible evidence was adduced at the trial as to how the role of the inserters has changed after they were hired as part-time employees under Respondent. Here, the evidence fails to demonstrate that the historic unit previously employed by CIN is no longer appropriate. Olga Mendez Gonzalez testified that inserters worked as nonunit employees of subcontractors to CIN for many years. There is no evidence that the mere fact that Respondent now employs the inserters as part-time employees has resulted in any change in the nature of the relationship between the employees in the historical unit and the inserters. Furthermore, the evidence establishes that inserters are paid far less than and work very different hours from Respondent's other employees. Without any evidence to the contrary, I find that the historical unit set forth in the collective-bargaining agreement remains appropriate.

In summary, of the 5 employees in Respondent's editing department, 3 were former CIN employees. (Jt. Exh. 23, para. 23.) In Respondent's editorial department, 12 of the 18 employees were former CIN employees. (Jt. Exh. 23, para. 24.) In the press department, 7 of Respondent's 8 employees previously worked for CIN. (Jt. Exh. 23, para. 25.) In the pre-press/dispatch department, both of Respondent's two employees were former CIN employees. (Jt. Exh. 23, paras. 18, 26.) In the classified department, neither of Respondent's two employees worked for CIN. Respondent's one employee in promotion events did not work for CIN. Thus, among bargaining unit employees, two-thirds, or 24 of Respondent's 36 bargaining unit employees, were former employees of CIN by December 15, 2013.

The alignment of Respondent's departments is not that different from that of CIN. Although Respondent has far fewer departments than CIN, several of CIN's old departments are now subdepartments in Respondent's organization. Furthermore, several members of CIN's Board of Directors remain on Respondent's Board of Directors. Additionally, some key supervisors of CIN, including Dekony, remain as supervisors for Respondent. The lack of total alignment between CIN's and Respondent's managers and Board of Directors is not fatal to a finding of successorship. In *GFS Building Maintenance, Inc.,* 330 NLRB 747, 752 (2000), the Board found that continuity is not destroyed and successorship is not defeated because a successor employer did not hire all of its predecessor's supervisors. See *Sierra Realty*, supra at 835, citing *Boston-Needham Industrial Cleaning Co., Inc.,* 216 NLRB 26, 27 (1975) (where other factors indicate that essentially the same operation has been continued, the fact that there may not be a substantial continuity in employment of the predecessor's supervisory staff is not of overriding importance).

Based on the foregoing principles, I find that the General Counsel demonstrated that there is a substantial continuity between Respondent and CIN. Accordingly, I find that Respondent is the successor employer to CIN for the employees who worked in the bargaining unit set forth in the contract between CIN and the Union. See *Van Lear Equipment, Inc*., 336 NLRB 1059, 1063–1064 (2001) (finding substantial continuity between the predecessor and successor because, although the successor provided a different supervisor, different pay rates and benefits, and newer buses to drive than the predecessor, the employee bus drivers were performing the same work that they performed for the predecessor); *M.S. Management Associates, Inc.*, 325 NLRB 1154, 1155 (1998) (finding substantial continuity where the successor provided the same housekeeping and HVAC services to the same set of customers, and with the same equipment, with no hiatus in operations.)

Furthermore, the extremely short hiatus in operations between CIN and Respondent militates in favor of a finding of successorship. CIN ceased printing El Vocero sometime in November 2013, the assets of CIN were sold to Respondent on November 22, 2013, and Respondent printed its first edition of El Vocero on December 1, 2013. Findings of substantial continuity have been made after much longer hiatuses. See *Jamestown Fabricated Steel and Supply, Inc.,* 362 NLRB No. 161 (2015) (substantial continuity found with hiatus of 6 months between predecessor's closure and successor's commencement of operations); *Tree-Free Fiber Co.,* 328 NLRB 389 (1999)

(substantial continuity found between two enterprises when there was a hiatus of 16 months between the closure of the predecessor and the commencement of operations by the successor.) Certainly, the very brief hiatus in operations in this case suggests that Respondent is a successor to CIN under the substantial continuity analysis.

I do not find that CIN's bankruptcy extinguished Respondent's status as a successor. Respondent bought all of CIN's equipment and property in a bankruptcy auction. The Notice of Sale for this auction included language, added at the Union's request, indicating that nothing in this Sale Order or the Asset Purchase Agreement shall be held to limit any independent obligation of the buyer that potentially could arise after the closing pursuant to the National Labor Relations Act. Based on the other evidence in this case, including Respondent's hiring of a substantial and representative complement of CIN's employees and its continuation of CIN's business in a largely unchanged format, I find that Respondent is a successor to CIN.

*D. Respondent was Obligated to Bargain with the Union*

Respondent's obligation to bargain with the Union matured when two conditions were met: (1) Respondent had hired a substantial and representative complement of employees, a majority of whom had been CIN bargaining unit employees; and (2) the Union had made an effective demand for recognition and bargaining. See *MSK Corp.*, 341 NLRB 43, 44 (2004). These two conditions need not occur in any particular order. Id. Where a union demands recognition from a prospective successor employer before that successor has hired a substantial and representative complement of employees, the union's demand is deemed to be a continuing one and the successor's bargaining obligation matures once it hires a substantial and representative employee complement. See *Simon DeBartelo Group*, 325 NLRB 1154, 1156 (1998), enfd. 241 F.3d 207 (2d Cir. 2001).

In deciding when a substantial and representative complement exists in a particular employer transition, the Board examines a number of factors. It studies "whether the job classifications designated for the operation were filled or substantially filled and whether the operation was in normal or substantially normal production." See *Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 628 (9th Cir. 1983). Respondent was fully operational as of December 1, 2013, and it had hired 105 employees by December 15, 2013. No evidence was presented at the hearing that Respondent planned to hire more employees in bargaining unit classifications after December 15, 2013. Thus, I shall evaluate whether, as of December 15, 2013, Respondent had hired a substantial and representative complement of CIN's bargaining unit employees.

I find, based on the totality of the circumstances, that Respondent employed a substantial and representative complement of CIN's employees as of December 15, 2013. As found above, among bargaining unit employees, two-thirds, or 24 of Respondent's 36 bargaining unit employees, were former employees of CIN as of December 15, 2013. The Union made its first demand to bargain with Respondent in its letter of December 17, 2103. By that time, Respondent had begun normal production of El Vocero. Accordingly, by December 15, 2013, when Respondent employed a substantial and representative complement of CIN's employees and when the Union made its demand to bargain, Respondent had an obligation to bargain with the Union.

I reject Respondent's argument that this allegation should be dismissed because the Union's letters of December 17 and 23 were not valid demands for recognition. (R. Br. p. 17). I note that the Union asserted that it was the historical representative of a unit of employees at El Vocero. Even assuming that this was not a valid demand for recognition by El Vocero's new owners, I find that the Union's letters triggered a bargaining obligation. In *Hampton Lumber Mills-Washington*, 334 NLRB 195 (2001), the Board held that an employer who had hired a substantial and representative complement of employees, a majority of whom were represented by a union at the predecessor, was obligated to recognize the union after "a demand for recognition or bargaining by the union." Thus, either a demand for recognition or bargaining is sufficient to trigger a bargaining obligation in a successorship situation. *Jamestown Fabricated Steel and Supply, Inc.*, 362 NLRB No. 161 (2015). In *Hampton Mills-Washington*, the union's letter, which was found sufficient to establish a bargaining obligation on behalf of the successor employer, requested recognition, but did not specifically request bargaining. 334 NLRB at 199. Conversely, in the instant case, the Union clearly sought bargaining, but its demand for recognition was not as clear. The Union's letters of December 17 and 23, 2013, specifically sought to "begin negotiation meetings" for a new collective-bargaining agreement. (Jt. Exhs. 17 and 18.) Thus, I find that the Union's letters of December 17 and 23, 2013, constituted a valid request for bargaining sufficient to establish an obligation to recognize and bargain with the Union after a substantial and representative complement of CIN's bargaining unit employees were hired.

Respondent cited several cases in its brief which are inapposite to the instant case. For example, Respondent cited *Always East Transportation*, Case JD–63–15 (2015) for the proposition that the Board has determined that there was no successor relationship where the alleged successor was a totally new employer, employees worked under new rules and procedures for different supervisors, and the operation was not merely a continuation of the [alleged predecessor's]. I note that *Always East Transportation* was decided by another judge and is pending before the Board on exceptions. As such, it has no precedential value at this time. *Colgate-Palmolive Co.*, 323 NLRB 515, 515 fn. 1 (1997).

I have carefully read Respondent's brief as well as the cases cited therein. I consider the arguments presented in defense of Respondent's position unpersuasive. Accordingly, I find that Respondent is a successor to CIN and employed a substantial and representative complement of CIN's employees as of December 15, 2013. Furthermore, I find that Respondent acquired substantial assets of CIN and continued, without interruption or substantial change, CIN's business operations. Thus, under the totality of the circumstances presented here, I find that Respondent was a successor to CIN which had an obligation to recognize and bargain with the Union as of December 17, 2013. By failing and refusing to do so, I find that Respondent violated Section 8(a)(5) and (1) of the Act.

*E. Respondent Violated the Act by Failing and Refusing to Provide the Requested Information to the Union*

In its December 17 and 23, 2013 letters, the Union sought the following information: (1) a list with the name of every employee, including their occupational classification at this time; and (2) the occupational hierarchy diagram of the different existing positions at El Vocero at the present time.[17] (Jt. Exhs. 17, 18.)

The evidentiary record establishes, and I find, that Respondent violated the Act in refusing to provide the information requested by the Union. Section 8(a)(5) of the Act provides that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of its employees." 29 U.S.C. §158(a)(5). An employer's duty to bargain includes a general duty to provide information needed by the bargaining representative in contract administration. *A-1 Door & Building Solutions,* 356 NLRB 499, 500 (2011). Generally, information concerning wages, hours, and other terms and conditions of employment for unit employees is presumptively relevant to the union's role as exclusive collective-bargaining representative. See *Southern California Gas Co.,* 344 NLRB 231, 235 (2005). By contrast, information concerning extra unit employees is not presumptively relevant; rather, relevance must be shown. *Shoppers Food Warehouse Corp.,* 315 NLRB 258, 259 (1994). The burden to show relevance, however, is "not exceptionally heavy," *Leland Stanford Junior University,* 262 NLRB 136, 139 (1982), enfd. 715 F.2d 473 (9th Cir. 1983); "[t]he Board uses a broad, discovery-type standard in determining relevance in information requests." *Shoppers Food Warehouse,* 315 NLRB at 259.

The Union's information requests, as they relate to bargaining unit employees, are presumptively relevant. However, some of the information sought by the Union in this case is not presumptively relevant. When a union seeks information concerning employees outside of the bargaining unit, there is no presumption of relevance and the union has the burden to show relevance in such circumstances. *E.I. DuPont de Nemours and Co.,* 744 F.2d 536, 538 (6th Cir. 1984). The standard for establishing relevance is a liberal discovery-type standard, which requires only the probability that the desired information was relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities.[18] *McKenzie-Williamette Medical Center,* 362 NLRB No. 20, slip op. at 1 (2015), citing *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 437 (1967).

In its letters, the Union made a clear demand for bargaining after asserting that it was the bargaining representative of El Vocero employees. The contents of these letters would apprise a reasonable person as to the relationship between the information requested and its demand to bargain. As such, I find that the contents of the Union's letters demonstrate that the Union was seeking potentially relevant information regarding Respondent's status as a successor to CIN.

In any event, even if a union's information request is ambiguous or concerns nonunit employees, this does not excuse an employer's blanket refusal to comply. *Keauhou Beach Hotel*, 298 NLRB 702, 702 (1990). In *Keauhou Beach Hotel*, the Board found that if a union's request included information regarding nonunit employees, this would not excuse the employer's blanket refusal to comply. 298 NLRB at 702. It is well established that an employer may not simply refuse to comply with an ambiguous or overly broad information request, but must request clarification or at least comply with the request to the extent it encompasses necessary and relevant information. Id. As such, I find that Respondent's blanket refusal to comply with the Union's information request violated Section 8(a)(5) and (1) of the Act.

REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

Respondent is ordered to recognize and bargain with Union de Periodistas, Artes Graficas y Ramas Anexas, Local 33225 (Union), as the exclusive collective-bargaining representative of its employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

> [A]ll . . . employees except . . . those that may be excluded . . . The following are excluded: (1) Administration: President, Executive Assistant to the president, Treasurer, Comptroller, Chief Accounting Officer, and seven executive secretaries who work in any department of the Company, Chief Personnel Officer and his or her secretary and security personnel and credit manager; (2) Advertising: Agency Advertisement Sales Director; Direct Advertisement Sales Director, Classified Ads and Notices Sales Director, and Advertisement Salesperson; (3) Circulation: Circulation Department Director, Island Supervisor, Metro Area Subscriptions Supervisor, Metro Area Lighting and Post Supervisor, two (2) Chief Dispatching Officers, four (4) At Large Regional Supervisors, Newspaper Carriers and Heralds; (4) Editorial: Director, Associate Director, and Chief Editor; (5) Production: Production Department Director, (2) Shop Supervisors, (3) Press; and (6) Supervisors (two during the day and one at night), Maintenance Engineer and Electrical Engineering Supervisor.

Respondent is ordered to furnish the Union with the information it requested in its December 17 and 23, 2013 letters that is relevant and necessary to the Union's role as the exclusive representative of the unit employees.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[19]

---

[17] Respondent did not address the information request allegation in its brief.

[18] Neither the Union nor the General Counsel made any showing as to why the information concerning nonunit employees was relevant. In fact, Nestor Soto, the author of the December 2013 letters, was never asked why the Union sought this information.

[19] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

## ORDER

The National Labor Relations Board orders that the Respondent, Publi-Inversiones de Puerto Rico, Inc. d/b/a El Vocero de Puerto Rico, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to recognize and bargain with Union de Periodistas, Artes Graficas y Ramas Anexas, Local 33225 (Union), as the exclusive collective-bargaining representative of the employees in the bargaining unit.

(b) Failing and refusing to furnish the Union with requested information that is relevant and necessary to the performance of the Union's function as the exclusive collective-bargaining representative of the employees in the bargaining unit.

(c) In any like or related manner interfering with, restraining, or coercing employees of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) On request, bargain with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

> [A]ll . . . employees except . . . those that may be excluded . . . The following are excluded: (1) Administration: President, Executive Assistant to the president, Treasurer, Comptroller, Chief Accounting Officer, and seven executive secretaries who work in any department of the Company, Chief Personnel Officer and his or her secretary and security personnel and credit manager; (2) Advertising: Agency Advertisement Sales Director; Direct Advertisement Sales Director, Classified Ads and Notices Sales Director, and Advertisement Salesperson; (3) Circulation: Circulation Department Director, Island Supervisor, Metro Area Subscriptions Supervisor, Metro Area Lighting and Post Supervisor, two (2) Chief Dispatching Officers, four (4) At Large Regional Supervisors, Newspaper Carriers and Heralds; (4) Editorial: Director, Associate Director, and Chief Editor; (5) Production: Production Department Director, (2) Shop Supervisors, (3) Press; and (6) Supervisors (two during the day and one at night), Maintenance Engineer and Electrical Engineering Supervisor.

(b) Furnish the Union with the information it requested in its December 17 and 23, 2013, letters that is relevant and necessary to the Union's role as the exclusive representative of the unit employees.

(c) Within 14 days after service by the Region, post at all of its facilities copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 12, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since December 17, 2013.

(d) Within 21 days after service by the Region, file with the Regional Director of Region 12 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

## APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to recognize and bargain with Union de Periodistas, Artes Graficas y Ramas Anexas, Local 33225, as the exclusive collective-bargaining representative of our employees in the bargaining unit.

WE WILL NOT refuse to furnish the Union with requested information that is relevant and necessary to its role as the exclusive bargaining representative of unit employees.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

> [A]ll . . . employees except as provided in Section B of this article and those that may be excluded pursuant to Section 5 of Article XX. The following are excluded: (1) Administration: President, Executive Assistant to the president, Treasurer, Comptroller, Chief Accounting Officer, and seven executive secretaries who work in any department of the Company, Chief Personnel Officer and his or her secretary and security personnel and credit manager; (2) Advertising: Agency Advertisement Sales Director; Direct Advertisement Sales Director, Classified Ads and Notices Sales Director, and Advertisement Salesperson; (3) Circulation: Circulation Department Director, Island Supervisor, Metro Area Subscriptions Supervisor, Metro

Area Lighting and Post Supervisor, two (2) Chief Dispatching Officers, four (4) At Large Regional Supervisors, Newspaper Carriers and Heralds; (4) Editorial: Director, Associate Director, and Chief Editor; (5) Production: Production Department Director, (2) Shop Supervisors, (3) Press; and (6) Supervisors (two during the day and one at night), Maintenance Engineer and Electrical Engineering Supervisor.

WE WILL furnish the Union with the information it requested on December 17 and 23, 2013, that is relevant and necessary to its role as the exclusive representative of the unit employees.

PUBLI-INVERSIONES DE PUERTO RICO, INC. D/B/A EL VOCERO DE PUERTO RICO

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/12–CA–120344 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.